UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ALICE BUCKHANAN                                          PLAINTIFF

VS.                              CIVIL ACTION NO. 3:13CV278TSL-JCG

ERIC K. SHINSEKI, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE UNITED STATES
DEPARTMENT OF VETERANS AFFAIRS;
VETERANS ADMINISTRATION MEDICAL
CENTER, JACKSON G.V. "SONNY" MONTGOMERY
MEDICAL CENTER; JOE BATTLE;
CHARLES DONELSON and DOES 1 through 10          DEFENDANTS

MEMORANDUM OPINION AND ORDER

    This cause is before the court on the motion of defendant

Erik K. Shinseki, in his official capacity as Secretary of the

United States Department of Veterans Affairs, for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff Alice Buckhanan has responded to the motion and the

court, having considered the memoranda of authorities, together

with attachments, submitted by the parties, concludes that the

motion should be granted as to plaintiff's claim of race, gender

and age discrimination.  The court, however, will reserve ruling

on defendant's claim for summary judgment as to plaintiff's claim

for retaliation.

    Claims

    Plaintiff Alice Buckhanan is an African-American female over

the age of 40.  She became employed as a police officer with the

Jackson VA Medical Center (VAMC) in 2002.  She was terminated from employment in August 2012, ostensibly because she failed to maintain qualification in the use of her service firearm, a condition of her employment.  In the present action, plaintiff alleges that her termination was the result of unlawful discrimination on the basis of race, gender, age and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623 *et seq.*[1]

Facts

From the time of her employment in 2002 until March 2011, when she sustained an on-the-job injury and was temporarily assigned to alternate duty, plaintiff worked as a police officer with the VAMC.  As a VAMC police officer, plaintiff was required to qualify with her firearm every six months, which she did up to the time of her injury.  In March 2012, after more than a year on alternate non-police duty, plaintiff was cleared by an Office of

---

[1]     Originally, in addition to naming Shinseki as a defendant in his official capacity, plaintiff also named as defendants Joe Battle, in his individual capacity and his official capacity as Director of the VAMC, and Charles Donelson, in his individual capacity and his official capacity as supervising police sergeant at VAMC, and, in addition to her federal claims, she asserted a number of state law claims, including claims for breach of employment contract, negligent and intentional infliction of emotional distress and workers' compensation retaliation.  By memorandum opinion and order entered October 3, 2013, the court dismissed all but the federal discrimination and retaliation claims against Shinseki.

Worker's Compensation physician to resume her normal law enforcement duties.  However, under VA policy, before she could return to duty as a police officer, plaintiff was required to pass physical and psychological examinations and to requalify with her weapon.  On May 18, 2012, immediately upon receiving notice that she had passed the physical and psychological exams, plaintiff was directed to report to the firing range to attempt to requalify with her weapon, notwithstanding that VA policy required that any officer separated from normal police duties for more than six months be offered firearms retraining before attempting to requalify with her weapon[2] and notwithstanding that plaintiff was not offered such training.

To qualify with a weapon, an officer is given up to three attempts of fifty rounds each and qualifies if she hits at least forty of fifty rounds completely inside the target.  During the testing on May 18, 2012, plaintiff failed in her first attempt to qualify.  Indeed, according to plaintiff's own testimony, she shot so poorly that she stopped after firing only about twenty rounds.

---

[2]   On this issue, plaintiff points out that Veteran's Affairs Handbook No. 730, Part 4(c), states, "When a VA police officer has been separated from a VA Police and Security unit for more than 6 months, the officer will be retrained and recertified before being issued a VA Form 1396, Weapons Authorization Card." Defendant does not dispute this.

3

The firearms instructor overseeing the testing, Conrad Hamp,[3]

recognized the difficulties plaintiff was having and concluded

that before proceeding with a second or third attempt, plaintiff

would need remedial training.[4]  According to plaintiff, initially

---

[3]     Hamp was not employed at the Jackson VAMC but rather at
the Law Enforcement Training Center (LETC) for the Department of
Veteran Affairs in Little Rock, Arkansas.  He was in charge of the
division responsible for firearms training and had been sent to
the Jackson VAMC, along with a number of other LETC instructors,
following an examination that revealed discrepancies in training
records for the Jackson VAMC's police officers, which indicated a
need for review of the Jackson VAMC's officers' firearms training
and certification.

[4]     In a May 19, 2012 letter to the acting chief of police
at the Jackson VAMC, Hamp wrote the following:
    One officer was given only one attempt as the lack of
    weapon handling skills, inability to shoot within the
    time limits, and total number of valid hits on the
    target were so far below the required amount, it was
    clear that giving two more attempts would not be helpful
    and counterproductive.  This officer was given some
    remediation to try and correct and hone her shooting
    skills.  Again, based on the time we had and number of
    officers, the remediation was short.  Over the many
    years training police officers on the range it was clear
    to me that this officer needed fundamental training
    prior to attempting to qualify.
Consistent with the statements in his letter, Hamp has testified:
    I just don't think the ... second and third attempt
    would have benefitted Ms. Buckhanan at all.  It was
    clear that – that she as well as others there needed
    some – some more basic firearms training than weapon
    handling.
        Even if she were to pass on the second and third –
    and again, this is just my opinion – I don't take any –
    any comfort knowing that an officer just gets by with
    qualifying after I've observed poor weapons management,
    the inability to draw the weapon efficiently, holster
    up, all the safety things.  If she were to pass and then
    go on duty with that weapon, in the back of my mind, it
    would have been still a very big liability for the

4

the plan was that she would return to the range the following day and have two more attempts to qualify.  However, it was later decided that she and two other officers who had failed to qualify would be sent to the Law Enforcement Training Center (LETC) in Little Rock, Arkansas for basic firearms retraining.  Accordingly, plaintiff, along with Officer Gregory Maples and Sergeant Lorraine Hudson, attended the LETC training course during the week of June 25-29, 2012.  The forty-hour course included classroom instruction and hands-on skill training designed to teach proper shooting stances, loading, holstering and unholstering of weapons, and shooting at various distances.  On the final day of training, the students performed a practice qualification test and received feedback before attempting to qualify.

After testing, plaintiff was informed that she had failed to qualify as the most hits she scored was 39, which she did in two of her three rounds.  Officer Maples and Sergeant Hudson also failed to qualify at LETC, and on July 3, 2012, all three employees were placed on administrative leave and recommended for termination by acting Police Chief Yolanda Motley on account of their "[f]ailure to maintain qualification in the use of agency approved firearms at an armed facility as a condition of employment."  As to plaintiff, the charge that she failed to

---

department itself.

5

qualify contained two specifications, as follows:  (1) that in May 2012, plaintiff "failed on three (3) attempts" to qualify; and (2) that after remedial training at the LETC during June 2012, she failed to qualify after three attempts.  Although plaintiff orally contested the recommendation for termination, Joe Battle, Director of the Jackson VAMC, accepted the recommendation and, by letter dated October 15, 2012, advised plaintiff that she was terminated effective November 2, 2012 based on her failure to qualify, as set forth in the initial recommendation letter, i.e., on account of her alleged failures on three attempts to qualify in May and again in June 2012.[5]  Her termination came two weeks after the Equal Employment Opportunity Commission (EEOC) issued a determination in favor of the VAMC on a charge of race and age discrimination that plaintiff had filed in August 2010.

On November 16, 2012, plaintiff filed an appeal of her termination to the Merit Systems Protection Board (MSPB). Following a March 14, 2013 hearing, the administrative law judge issued an opinion sustaining the termination and rejecting plaintiff's claims of race, gender and age discrimination and retaliation.  Plaintiff then timely filed the present action.

---

[5]     Officer Maples was not terminated because, after receiving his proposed removal notice, he resigned.  In response to her notice of proposed removal, Sergeant Hudson submitted a request for reasonable accommodation to the VAMC Reasonable Accommodation Committee.  Ultimately, the committee approved her request and she was transferred to another department.

Race and Age Discrimination

While defendant has moved for summary judgment on all of plaintiff's claims, plaintiff has offered a substantive response in support of only her gender discrimination and retaliation claims.  She does not address her age discrimination claim at all and offers no evidence to support such claim.  As to the race discrimination claim, her memorandum of authorities does include a section entitled "Proof of race discrimination", but nothing in that section – which is a mere two sentences – suggests a valid factual or evidentiary basis for the claim.[6]  Accordingly, in view of plaintiff's failure to present any evidence in support of her claims of race and age discrimination, the court concludes that defendant is entitled to summary judgment on these claims.

Gender Discrimination

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect

---

[6]     While not entirely clear, plaintiff's position appears to be that the VA's negative reaction to her 2010 EEOC charge alleging race discrimination provides circumstantial evidence that she was the victim of race discrimination.  However, a conclusion of race discrimination cannot reasonably be inferred merely from proof – assuming that such proof actually exists - that the VA treated plaintiff unfavorably after she filed a charge of race discrimination.  Such proof might support a claim of retaliation, but not of race discrimination.  See Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009)(*prima facie* case of race discrimination requires proof, *inter alia*, that the plaintiff was treated less favorably than an employee outside her protected class or that she was replaced by someone outside her protected class).

to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  An employer's action is unlawful if gender was "a motivating factor" for terminating an employee.  <u>Leal v. McHugh</u>, 731 F.3d 405, 411 (5th Cir. 2013) (citation omitted).  In adjudicating Title VII claims of gender discrimination where there is no direct evidence of discrimination based on gender, the court applies the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  <u>Johnson v. Louisiana</u>, 351 F.3d 616, 621 (5th Cir. 2003). Under this framework, a plaintiff first must make a *prima facie* case of unlawful gender discrimination.  <u>Id</u>.  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged action. <u>Id</u>.  If it does, the plaintiff must then prove that the defendant's stated reason is pretextual.  <u>Id</u>.  <u>See also Khalfani v. Balfour Beatty Communities, L.L.C.</u>, --- Fed. App'x ----, 2014 WL 7229499, at *1 (5th Cir. 2014).  To establish a *prima facie* case of gender discrimination, plaintiff must show "(1) [s]he is a member of a protected class, (2) [s]he was qualified for the position at issue, (3) [s]he was the subject of an adverse employment action, and (4) [s]he was treated less favorably because of h[er] membership in that protected class than were

8

other similarly situated employees who were not members of the protected class, under nearly identical circumstances." <u>Lee v. Kansas City S. Ry. Co.</u>, 574 F.3d 253, 259 (5th Cir. 2009).

In the case at bar, defendant maintains that plaintiff cannot establish a *prima facie* case of gender discrimination because (1) she cannot establish that she was qualified for the position; and (2) she cannot establish that she was treated differently than a similarly situated person outside her protected class or replaced by someone outside her protected class. It contends that summary judgment is therefore in order.

On the issue of qualification for a position, the Fifth Circuit has suggested that an employer's argument that an employee is not qualified for a position typically is belied by the fact that the employee was hired in the first place and retained in employment. See <u>Taylor v. Peerless Indus. Inc.</u>, 322 Fed. App'x 355, 357 n.1 (5th Cir. 2009). Thus, it has held that generally, "performance concerns are more appropriately addressed in assessing a plaintiff's assertion that an employer's articulated reason for its action was a pretext" than at the *prima facie* stage. See <u>id.</u> That is, "a plaintiff challenging his termination or demotion can ordinarily establish a *prima facie* case of ... discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action" and that he "had not suffered physical disability or loss

of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired." Holliday v. Commonwealth Brands, Inc., 483 F. App'x 917, 921 (5th Cir. 2012) (internal quotation marks and citation omitted). "The lines of battle may then be drawn over the employer's articulated reason for its action and whether that reason is a pretext for ... discrimination." Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1506 (5th Cir. 1988). However, in the case at bar, defendant notes that qualifying with an authorized firearm is a condition of employment with the VAMC Police Department. Thus, although plaintiff initially qualified in 2002 and maintained her weapons qualification up until her injury in 2011, defendant contends that at the time of her termination, she was no longer qualified for the position as a result of her failure to qualify with her service weapon following her May 2012 release to return to normal law enforcement duties. More particularly, defendant asserts that since plaintiff failed to qualify with her firearm following remediation training at the LETC in June 2012, she cannot establish that she was qualified for the position.[7] For her part,

---

[7] Under Jackson VAMC's policies, an officer will not be considered to have failed to qualify unless she is given three attempts to achieve the minimum score of forty. Consequently, defendant has acknowledged that while plaintiff did not qualify with her weapon in May 2012 since her testing was cut short after only her first attempt to qualify, she could not be deemed to have *failed* the qualification testing.

plaintiff does not dispute that qualifying with her weapon was a condition of her employment.  However, she maintains that she has at least created a genuine issue of material fact as to whether she was qualified for the position.

Among other things, plaintiff argues that an issue of fact exists based on evidence that the qualifying test administered by the VA in May 2012 was "dishonest".  In this regard, she claims that documentation from the May 18, 2012 testing was falsified because she fired only fifty duty rounds on that date and the VA record reflects that an additional 150 duty rounds were fired, for a total of 200 rounds.  Further, according to plaintiff, someone forged her signature on her score sheet which showed that she failed the first round of the test on May 18.  In the court's opinion, even if the evidence did show that these records were falsified, this would not tend to create a genuine issue of material fact on plaintiff's *prima facie* case because defendant does not contend that plaintiff was not qualified due to having failed to qualify during the testing in May but rather because plaintiff, after receiving remedial training, was tested at the LETC in June 2012 and failed to qualify.[8]

---

[8]     Plaintiff appears to suggest that her evidence that defendant falsified the documentation relating to the May 2012 firearms testing supports an inference that defendant contrived a basis to terminate her, which she claims is further bolstered by the fact that the termination letter wrongly recited that plaintiff failed to qualify in three attempts in May 2012 and

11

Plaintiff acknowledges that the LETC testing in June provided her with the required three attempts to qualify and that she was recorded as scoring 39, 27 and 39, respectively.  However, she argues that although the highest score she was credited with achieving was 39, there is evidence that she actually did score enough hits in the targets to qualify at the LETC.  In other words, she claims there is evidence which shows that she actually scored higher than 39 on her firearms test at the LETC and that she actually did qualify with her firearm, as a result of which she was qualified for the position of VAMC police officer.  Having carefully reviewed the evidence, the court concludes that plaintiff has failed to create a genuine issue as to whether she attained a qualifying score during the LETC testing in June.

As support for her position that she did, in fact, score enough hits to qualify, plaintiff offers her own testimony from her March 2013 MSPB hearing and from her November 2014 deposition, along with her January 2015 affidavit prepared in support of her response to defendant's motion.  At the MSPB hearing, plaintiff

---

offered that as a specification for her failure to qualify and hence as a basis for her termination.  However, as defendant has admitted that plaintiff did not complete the testing in May since she was given only one attempt to qualify and has admitted that Police Chief Motley and VAMC Director Battle were thus mistaken in asserting that she failed to qualify in May after three attempts, plaintiff's evidence that the VA's records relating to the May testing were falsified does not go to the question whether she was in fact qualified but rather is relevant, if at all, only on her pretext argument.

testified that she felt good about her shooting during the
qualifying rounds at the LETC and believes she scored over forty
on at least one of her rounds.  It is apparent from this
testimony, however, that her professed belief that she qualified
during the LETC testing was based on nothing more than hearsay and
speculation.  Plaintiff testified:

> A.  I felt good about my ... shooting.  But like I said,
> the targets – here in Jackson you could always, in
> between courses of fire, you could look at your target
> and you could see where your rounds are going.
>      In Little Rock when you ... stop shooting, the
> targets are (indiscernable) away from you.  You can't
> see where your rounds are; you can't make any
> adjustments or anything.  But I just felt good because I
> knew that my sight alignment was good.  I felt like
> everything was on point.
> Q.  Basically your experience and training, including
> your training that week, you believe that you scored
> over 40 on that last round?
> A.  I do.
> Q.  And what do you base that on?
> A.  I base that in part upon the fact that – not just
> the last round but the first round – I base it upon the
> fact that they came out – the other two guys that came
> with me, they immediately put their nonpassing scores up
> there.  Everyone else, they got either a pass or if you
> don't pass, they put the number of hits that you have on
> your target.  And I didn't see them put it on the back
> of the target.  Maybe I was just tense and didn't notice
> it.  But they put it on the front of your target in the
> upper left-hand corner.
>      It took – it was probably four instructors out
> there the first time, discussing my target.  And the
> other two that went with me kept saying, you qualified,
> you qualified.  I would – I turned my back.  I didn't
> look at the target.  So they came and said, well, there
> was a question about whether you had three rounds
> through the same hole or whether it was two hits.  And
> that's what we're doing.  So ultimately they put the
> number up there afer about ten, no less than ten
> minutes, it was 39.

When questioned about the LETC testing in her later deposition, plaintiff acknowledged that she did not personally count the hits on the target, and yet she undertook to testify affirmatively that she qualified on both her first and second attempts at the LETC.  However, the reasoning by which she arrived at her conclusion was unsound.  Plaintiff claimed that since there was discussion among the instructors about how many hits she had, then she qualified because, "where there's discussion about a dispute about a hit, it's always supposed to go to the shooter."[9]

Plaintiff's reasoning does not support her professed conclusion that she qualified, for while there may have been some discussion among the instructors about how many hits plaintiff had, plaintiff does not dispute that the instructors who examined her targets ultimately agreed that she had only 39 hits in her first and last attempts.  Raymond Brantis, one of the firearms instructors who worked with plaintiff at the LETC, explained at plaintiff's MSPB hearing that it is standard LETC practice for

---

[9]     Plaintiff's testimony in her deposition was as follows:
Q.  So you're disputing the counting of the number of hits on the target?
A.  Yes.
Q.  Okay.  Did you count the hits on the target?
A.  I was not allowed to.
Q.  So how would you know how many hits you had on the target?
A.  Because in both instances there was a lot of discussion about whether there was the additional hit on the target and when there's discussion about a dispute about a hit, it's always supposed to go to the shooter.

14

another instructor to independently score a target if the first instructor counts less than forty holes inside the target and for the instructors to then compare their results.  If there is any disagreement about a student's score when the instructors compare their tallies, the student is given the benefit of the doubt on the disputed shot.  He further testified that for each attempt, a new cardboard backing is placed on the target which makes it easier to accurately identify hits.  Thus, regardless of what plaintiff may believe about the scoring process at LETC, it does not follow from the mere fact that there was discussion among the instructors about the scoring of her hits that she qualified with her weapon.

In her recent affidavit prepared and submitted in response to defendant's motion, plaintiff states that she did qualify during the LETC test, stating,

> I know my shooting skills, observed where the bullets were hitting, and recognized that I actually scored higher than 39 on at least two of the rounds in Little Rock.  I was not permitted to check the targets as was standard prior practice.

In the court's opinion, to the extent plaintiff's assertion that she "observed where the bullets were hitting" and "recognized" that she scored higher than 39 is meant to convey the impression that she personally observed that each of at least 40 shots hit within the prescribed target and that she thus knew of her own personal knowledge that she had more than 39 hits, her affidavit

15

is clearly inconsistent with her prior testimony.  In the hearing, she was able to state only that she "felt good" about her shooting because she "knew that [her] sight alignment was good" and "felt like everything was on point."  She further testified at the hearing that in Little Rock, "[y]ou can't see where your rounds are; you can't make any adjustments or anything," which is inconsistent with the assertion in her affidavit that she was able to "observe where the bullets were hitting."  Plaintiff's explanation in her deposition that she was able to deduce that she scored over 39 from the fact that there was discussion among the instructors about scoring her hits is similarly at odds with her recent assertion that she "observed where the bullets were hitting" and "recognized" that she had more than 39 hits.[10]  Accordingly, her affidavit testimony is properly disregarded.  See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party

---

[10]     The court notes, too, that in light of her prior testimony, it is apparent that plaintiff's assertion that she "was not permitted to check the targets as was standard prior practice" is accurate, in part, but also misleading.  Plaintiff testified that in Jackson, it was the standard practice that "if you don't qualify, you're allowed to look at your target because that way you can get an idea of what you're doing wrong" and make adjustments.  In Little Rock, however, for safety reasons, shooters were not permitted to go down the range to view their targets between rounds and it was for this reason only that plaintiff did not have an opportunity to examine her targets. There is no evidence to show whether she would have been permitted to do so had she asked because, according to her own testimony, she never asked to see her targets.

16

to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."). Plaintiff has offered no competent summary judgment evidence to create a genuine issue of material fact as to whether she did qualify with her weapon in June 2012.

As further evidence that she is qualified for the position, plaintiff points out that since her termination, she has been tested by an independent instructor and qualified to shoot under circumstances identical to those in which she was tested by the VA. However, the testing to which she refers was done in March 2014, nearly two years after her suspension and termination from the VA. This test is not relevant to the issue of whether plaintiff was qualified at the time she was terminated in 2012.

Finally, plaintiff appears to take the position that she should be deemed qualified for the position since the VA, which controlled her ability to attempt to qualify with her weapon, deprived her the full and fair opportunity to do so. In this regard, plaintiff argues that even if she failed to qualify during the LETC firearms proficiency testing, she was not subject to termination since VA policy required that an officer who fails to qualify (even after remedial training) must be offered one further opportunity for remedial training and a retest. In other words, she claims that termination is an appropriate penalty only when an officer has twice failed to qualify. She submits that since she

17

only failed the firearms test once, in June, then she was entitled to retraining and a retest, which was denied her.  In addition, she argues that under the master agreement applicable to union members such as herself, upon the failure to qualify at the LETC, she was entitled to be placed on a Performance Improvement Plan, and yet this did not occur.

In its briefing on the motion, including in its rebuttal, defendant does not address plaintiff's contention that she was entitled under VA policy to further training and a retest after her failure to qualify during testing at the LETC, which was her first and only failure to qualify.  Further, while defendant argues in its rebuttal memorandum that the provision of the master agreement setting forth the circumstances in which an employee will be placed on a Performance Improvement Plan did not apply in plaintiff's circumstance, this argument fails to account for the deposition testimony of VAMC Associate Director Tracy Skala,  in which she indicated that plaintiff "would [have been] entitled to a performance improvement plan in some form" following her failure to qualify in June.  In view of these omissions by defendant, the court at this point will assume for purposes of plaintiff's *prima facie* case that plaintiff could show that at the time of her termination, she remained qualified for the position as she had not twice failed to qualify with her weapon.

18

Defendant argues that even if plaintiff could establish an issue of fact as to whether she was qualified for the position, she cannot establish a *prima facie* case of gender discrimination since she has failed to identify any similarly situated person outside her protected class that was treated more favorably or present competent evidence to show that she was replaced by someone outside her protected class.  Plaintiff disputes both assertions.  Having carefully considered the evidence on this issue, the court concludes that plaintiff has failed to create a genuine issue of material fact on this element of her *prima facie* case.

To meet her burden on the fourth element of her *prima facie* case, plaintiff must "compare [her] treatment to that of nearly identical, similarly situated individuals ... [and] must show that [defendant] gave preferential treatment to another employee under 'nearly identical' circumstances."  Bryant v. Compass Grp. USA Inc., 413 F.3d 471, 478 (5th Cir. 2005).  To that end, plaintiff notes in her response to the motion that defendant has stated in discovery responses that during the last three years, "at least 3, but fewer than 7 employees" have failed to adequately complete firearms proficiency testing and that no employee (other than plaintiff) has been terminated for failing to adequately complete firearms proficiency testing.  She notes that while the VA objected to disclosing the identity of the individuals who failed

19

to qualify in firearms proficiency testing, she knows of four male officers – Dwayne Buie, Gary Patrick, Howard McBound, Claude Wynn – who failed firearms testing and yet were allowed to remain in the VA's employment.

Plaintiff testified at her MSPB hearing that Howard McBound was unable to qualify in his first three attempts during firearms testing on May 19, 2012, and thus failed to qualify; and although he ultimately did pass, he was able to do so only after being given additional attempts to qualify.  However, plaintiff has admitted that she was not present during McBound's firearms testing and that she based her testimony solely on subsequent statements by McBound to the effect that "if it had not been for Conrad [Hamp, instructor], he would not have passed."  It is thus clear, as defendant aptly points out, that her testimony is based not on personal knowledge but rather on hearsay and accordingly is not competent summary judgment evidence.  See Winding v. Lard, Civ. Action No. 3:13cv142-DPJ-FKB, 2013 WL 6730097 (S.D. Miss. Nov. 21, 2013) (hearsay not competent summary judgment evidence).

Plaintiff's testimony regarding Gary Patrick is not altogether clear.  In her March 2013 MSPB hearing, she testified that Patrick, like McBound, was given additional rounds in order to qualify with his weapon on May 19, 2012.  As with McBound, she admitted she was not present during Patrick's alleged qualification testing and based her testimony on Patrick's

statement that he would not have passed without Conrad's help.
Plaintiff's testimony regarding Patrick's alleged May 2012 testing
is inadmissible for the same reason plaintiff's testimony
regarding McBound's May 2012 testing is inadmissible.  However, in
her November 2014 deposition, plaintiff testified that during
testing prior to 2010, Patrick initially failed his firearms
qualification test but his failure was recorded as a pass and he
was then allowed to receive remediation and be retested.
Plaintiff did not contend that Patrick failed the testing after
remediation.  For this reason, as well as the fact that this
alleged failure occurred at least two years prior to plaintiff's
and was under different supervisors and a different director, the
court concludes that plaintiff has failed to show that she and
Patrick were similarly situated.[11]   See Arceneaux v. Metro. Life
Ins. Co., 481 Fed. App'x 196, 198-99 (5th Cir. July 18, 2012)
(holding that circumstances were not nearly identical when there
was a span of several years between the events and a change in
supervisors occurred during that time).

---

[11]    Plaintiff testified that Patrick's pre-2010 testing
occurred under former Jackson VAMC Police Chief Lumpkin and/or
former firearms instructor Bennett.  Defendant has claimed in its
motion, and has presented supporting evidence which shows that the
Jackson VAMC Police Department under the leadership of Chief
Lumpkin and instructor Bennett came under intense scrutiny in
early 2012 for discrepancies in the training records and firearms
qualifications records and both of those individuals were relieved
of their duties prior to plaintiff's qualification attempts in May
2012.

Plaintiff also testified in her deposition that someone named Dwayne Buie failed a firearms qualification test sometime in the three years prior to her termination, but she has offered no evidence as to the circumstances under which this alleged failure occurred and thus has failed to show that Buie is a proper comparator.

Plaintiff last claims that Claude Winn failed a firearms test and was allowed to remain in the VA's employment. However, she has offered no further information about the circumstances of Winn's alleged testing or his alleged failure to qualify. On the other hand, defendant has presented an affidavit from Center Director Battle in which he states after Wynn failed a firearms qualification test in October 2014 but before a proposed notice of removal was issued on account of that failure, Winn submitted a request for reasonable accommodation. That request was granted by the VA's Reasonable Accommodation Committee and Winn was moved to another department. While Winn was not terminated, plaintiff has not shown that his circumstances were "nearly identical" to hers.[12]

From the foregoing, the court concludes that plaintiff has failed to identify any similarly situated male employee who was

---

[12]     The only other male plaintiff has identified as having failed his firearms proficiency testing is Gerald Maples, who failed in Little Rock at the same time as plaintiff. Like plaintiff, Maples was issued a notice of proposed termination, but he elected to resign rather than be terminated.

treated more favorably than she.  The court also concludes that she has failed to present evidence sufficient to create an issue as to whether she was replaced by someone outside the protected class.  On that issue, plaintiff notes that VAMC Director Battle testified at the MSPB hearing that a male officer was hired in or before March 2013.  However, this individual was recommended for termination in March 2013 on account of his failure to pass his initial firearm proficiency testing in Little Rock.  Plaintiff disputes that this individual was in fact terminated, and she contends that he must have been hired to replace her.  Neither side has provided the name of this individual or presented competent evidence as to the outcome of the recommendation for his termination.  That is, there is nothing in the record to indicate whether or not he was, in fact, terminated following his failure to qualify with his weapon in March 2013.[13]  As defendant points

---

[13]    During her deposition in November 2014, plaintiff stated that in light of Battle's hearing testimony that a recently-hired officer had failed his weapons qualification and been recommended for termination, she "inquired [and] found out" that this individual's name was Wynn or Winn.  She then asked a former police officer she knew (someone named Donald Hubbard) if he knew "a guy named Wynn that went to the academy and failed their firearms portion of the academy, and they said yes, that person was at the vet center," an advocacy agency for veterans that is operated by the VAMC.  On this basis, plaintiff testified she knew that this Wynn/Winn individual "wasn't terminated for failing his firearms as Mr. Battle indicated."  However, plaintiff's evidence that the individual hired in 2013 was named Wynn/Winn is patently hearsay, as is her testimony as to the outcome of the recommendation for the unidentified officer's termination.  Battle testified in his deposition that he could not recall what had come

out, however, as a result of the termination of plaintiff, the resignation of Maples and the reassignment of Hudson to another department, the VAMC police force was down three officers; and plaintiff has offered no evidence to show that the unidentified male officer hired in March 2013 was hired to fill the position vacated as a result of her termination. Accordingly, she has failed to present sufficient evidence as to the fourth element of her *prima facie* case. As a result, defendant is entitled to summary judgment on plaintiff's gender discrimination claim.

Even if the court were to conclude that plaintiff could establish a *prima facie* case of gender discrimination, summary judgment would still be in order on this claim since plaintiff cannot demonstrate that defendant's proffered legitimate, nondiscriminatory reason for her termination, is pretext for discrimination. Once a defendant offers a legitimate, nondiscriminatory reason for its challenged employment decision, the plaintiff must show that the reason is pretext for discrimination. A plaintiff may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct.

_____

of the recommendation for this officer's termination.

2097, 147 L. Ed. 2d 105 (2000)).  Plaintiff argues that defendant's articulated reason is unworthy of credence as "it is not believable to think that where males have failed to pass the firearms test and retain their jobs, that this female was actually being fired for a firearms condition."  However, as discussed supra, plaintiff has offered no evidence of any male officer who failed weapons qualification and was not terminated, nor has she offered proof that any male officer was given additional opportunities to qualify that were not extended to her.

Accordingly, based on all of the foregoing, plaintiff's claim for gender discrimination will be granted.

<u>Retaliation</u>

Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a)).  To prove a retaliation claim, the plaintiff must make a *prima facie* case that: "(1) she participated in a protected activity, (2) her employer took an adverse employment action against her, and (3) there is a causal connection between the protected activity and the adverse employment action." <u>Roberts v. Lubrizol Corp.</u>, 582 Fed. App'x 455, 460 (5th Cir. 2014) (citing <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 556-57 (5th

Cir. 2007)).  As with her discrimination claim, if plaintiff presents a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the action.  Id.  If it does so, the burden then shifts back to plaintiff to prove that the employer's justification is a mere pretext for retaliation and that she would not have been terminated "but for" having engaged in protected activity.  Id. (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).  A plaintiff may demonstrate pretext by showing disparate treatment or "by showing that the employer's explanation is false or unworthy of credence." Laxton, 333 F.3d at 578.

Defendant acknowledges that plaintiff engaged in protected activity in that she filed a charge of discrimination with the EEOC in August 2010.  It also acknowledges that plaintiff suffered an adverse employment action, as she was terminated in November 2012.  It contends, though, that plaintiff cannot establish a causal connection between her EEOC charge and her later termination.  At the *prima facie* stage, the showing of causation is "much less stringent than a 'but for' standard." Flanner v. Chase Inv. Services Corp., No. 13-31132, 2015 WL 408602, at *5 (5th Cir. Feb. 2, 2015).

Plaintiff submits that proof of causation (as well as of pretext) exists in the fact that defendant offered to allow her to

attempt to qualify with her weapon and return to duty if she would agree to waive her EEOC claim (as well as any other pending or future claims). Specifically, she states that after she returned from Little Rock, she was told by VAMC Director Battle that she would be allowed to take the second test to which she was entitled under applicable VA regulations, but only if she would agree to waive her EEOC claims. Defendant responds that plaintiff's proof in this regard is inadmissible "as it was all due to settlement negotiations that occurred between the VAMC and Plaintiff's representative." See Fed. R. Evid. 408 (precluding admission of evidence, conduct, or statements made during settlement negotiations to prove claim). For her part, plaintiff denies that the offer was part of any settlement discussions and asserts that defendant's purported offer was made in response to her request that she be afforded the rights and opportunities to which she was already entitled.

Plaintiff does assert, and has presented evidence which, in the absence of explanatory evidence from defendant, arguably could be interpreted as supporting her position that following her initial failure to qualify at the LETC, she was entitled under applicable VA policies to additional training and/or a performance improvement plan, and to be retested. Further, she has presented evidence that supports her assertion that defendant refused to afford plaintiff a further opportunity to qualify – an opportunity

27

to which she claims she was entitled – unless she would drop her
EEOC claim.  While defendant characterizes its "offer" to "allow"
her to retest on the condition that she waive any and all pending,
existing or future claims as part of settlement discussions, it
has offered no evidence to support this position.  It merely cites
a few lines of deposition testimony from VAMC Director Battle's
affidavit in which he confirmed that such an "offer" was made.  No
evidence is presented as to the timing or context or the full
content of these alleged discussions.  Under the circumstances,
the court is not warranted in merely accepting defendant's
characterization of the "offer" as a settlement offer.  However,
neither is the court able to conclude from the evidence of record
at this point that the "condition" that was placed in plaintiff's
retesting was not made in the context of and as part of settlement
discussions.

    If the court were to assume for the sake of argument that the
evidence is admissible, the court would conclude that plaintiff
has presented sufficient evidence of causation to satisfy both her
burden at the *prima facie* stage and her burden to show pretext.
However, without this evidence, her retaliation claim would fail
for, in the court's opinion, there is no other evidence that would
tend to show causation, or to show pretext.  In this regard, the
evidence shows that plaintiff filed her EEOC charge more than two
years prior to her termination.  Although the charge remained

28

pending during most of that time, as defendant notes, it would seem to defy reason to find that the VA would wait two years after plaintiff filed her EEOC complaint to retaliate against her for doing so.  Moreover, the proposal for plaintiff's termination came from Police Chief Motley, who was first detailed to the Jackson VA in late June 2012 and was unaware of plaintiff's pending EEO complaint; all Motley knew was that plaintiff had failed to qualify with her service weapon.  While VAMC Director Battle, the ultimate deciding official, was aware of the 2010 EEO claim when he made the decision to terminate plaintiff, plaintiff's EEOC charge did not involve Battle and it related to actions that occurred years before he became director in April 2012.

In an apparent effort to demonstrate causation and pretext, plaintiff asserts that after she filed her EEOC complaint, defendant commenced a campaign to retaliate against her by contriving reasons – none of them genuine – to terminate her employment, culminating, ultimately, in the decision to discharge her for failing to qualify when in fact, she had not twice failed to qualify, as required for termination under VA regulations.  She claims, for example, that defendant attempted to remove her by subverting her psychological exam in March 2012[14]; by accusing her

---

[14]   Plaintiff claims that prior to her psychological interview to determine whether she was qualified to return to duty as a police officer, Sergeant Charlie Donelson falsely informed the psychologist who performed the interview - a Dr. Williams -

of cheating during the written portion of the May 2012 firearms test[15]; and by trying to begin disciplinary action against her when she requested reasonable rest before being sent to the LETC in June 2012 for firearms testing.[16]  As there is no competent proof linking any of these these alleged incidents to Director Battle, the evidence cannot reasonably be found to demonstrate causation; nor does it suggest pretext.

---

that another supervisor, Lisa Bruce, had been critical of plaintiff.  The only  evidence plaintiff has offered to support this assertion is inadmissible hearsay.  Moreover, there is nothing to indicate that Donelson had any involvement in the termination decision by Battle, or conversely, that Battle was influenced at all by the controversy surrounding plaintiff's initial psychological evaluation.  Finally, the evidence establishes that at plaintiff's request, the VA disregarded the partial evaluation submitted by Dr. Williams and permitted plaintiff's psychological evaluation to be conducted by an independent psychologist, who found her to be fit for duty.

[15]    Plaintiff asserts that on May 17, 2012, during the written portion of her firearms test, a visiting police chief observing the test taking, made a comment which indicated he believed plaintiff was cheating when, in fact, she was not.  There is nothing to show that the individual who made the alleged comment had any knowledge of plaintiff's EEOC activity or any involvement in her termination.

[16]    Plaintiff claims that after she requested to Sergeant Donelson that her schedule be changed so that she would have sufficient rest before travel to Little Rock for firearms testing, Officer Donelson reported to his superiors that plaintiff had used profanity when he denied the request and he recommended that disciplinary action in the form of a written notation of counseling be placed in her personnel file.  However, no action was taken on his recommendation.  Plaintiff denies she used profanity and claims that Donelson's report was false.

The Fifth Circuit has acknowledged that course of employer conduct can be relevant on the issue of pretext, explaining that "the combination of suspicious timing with other significant evidence of pretext," such as "proof of a sharp decline in treatment immediately after the protected conduct occurred", can warrant denial of a summary judgment motion.  Khalfani v. Balfour Beatty Communities, L.L.C., --- Fed. App'x ---, 2014 WL 7229499, at *1-2 (5th Cir. Dec. 28, 2014) (internal quotation marks and citation omitted).  Here, however, these various incidents cited by plaintiff as suggestive of pretext occurred nearly two years after she filed her charge.  As was the case in Khalfani, there is no evidence here of "clear temporal proximity between the complaints and the [alleged] negative [treatment], making it difficult to find the sharp decline in treatment [the Fifth Circuit has] previously used to infer causality, and with it, pretext."  Id. at *2.[17]

In light of all of the foregoing, and particularly in view of the court's inability to determine on the basis of the present record the admissibility of plaintiff's evidence regarding defendant's conditioning her ability to retest on dropping her EEOC claim, the court finds that it cannot grant summary judgment

---

[17]    The court notes that plaintiff has not purported to present evidence of disparate treatment in connection with her retaliation claim.

31

to defendant on plaintiff's retaliation claim at this time.  The court will therefore reserve ruling on the motion as to the retaliation claim and allow defendant an opportunity to supplement its motion to address plaintiff's assertions regarding her entitlement to further training and retesting and to attempt to support, with proper proof, its objection to the admissibility of evidence which it contends constituted part of settlement discussions.

In conclusion, therefore, it is ordered that defendant's motion for summary judgment is granted as to plaintiff's claims of race, age and gender discrimination.  The court reserves ruling on defendant's motion for summary judgment on the retaliation claim, and orders that defendant, should it choose to supplement its motion to address the specific matters identified by the court herein, shall have fourteen days from this date in which to do so. Should defendant choose to supplement its motion, plaintiff shall have fourteen days in which to respond.

SO ORDERED this 19th day of February, 2015.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE